**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| JOHN CHIANG, California State Controller, | ) ) ) ) |
| Plaintiff, | ) ) ) Civil Action No. 04-199 (EGS) |
| v. | ) ) |
| DIRK KEMPTHORNE, Secretary of the Department of Interior, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION**

Plaintiff John Chiang, California's State Controller, brings this case against the Department of the Interior in order to challenge several administrative decisions made by the department and its Minerals Management Service ("MMS").[1] The case is stayed in part due to ongoing administrative proceedings, but the parties have been allowed to proceed on two of plaintiff's claims, which relate to royalty collections and MMS Guidelines issued in 2002. Pending before the Court are the parties' cross-motions for partial summary judgment on these two claims. Upon consideration of the motions and supporting memoranda, the responses and replies thereto, the applicable law, and the entire

---

[1] John Chiang and Dirk Kempthorne have been automatically substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d)(1).

1

record, the Court determines that the Court has jurisdiction over plaintiff's claims and that MMS's actions violate the Administrative Procedures Act ("APA").  Therefore, for the reasons stated herein, plaintiff's motion for summary judgment is **GRANTED**, and defendants' for summary judgment is **DENIED**.

**BACKGROUND**

**I. Statutory Background**

The Supreme Court recently issued a decision regarding MMS royalty collections, which helpfully describes the statutory scheme at issue here.  *See BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638, 641-42 (2006).  "The Mineral Leasing Act of 1920(MLA) authorizes the Secretary of the Interior to lease public-domain lands to private parties for the production of oil and gas."  *Id.* at 641 (citing 30 U.S.C. § 181 *et seq.*).  MLA lessees are obligated to pay a royalty of at least 12.5 percent of the value of the production generated from the lease.  *Id.*

In 1982, Congress enacted the Federal Oil and Gas Royalty Management Act ("FOGRMA") to address concerns regarding the accounting and collection of royalty payments.  *Id.* (citing 30 U.S.C. § 1701 *et seq.*).  Congress directed the Interior Department to "audit and reconcile, to the extent practicable, all current and past lease accounts for leases of oil or gas and take appropriate actions to make additional collections or

refunds as warranted." *Id.* at 641-42 (citing 30 U.S.C. § 1711(c)(1)).  These duties were assigned to the MMS.  *Id.* at 642 (citing 30 C.F.R. § 201.100).

Under FOGRMA, lessees are responsible in the first instance for the calculation and payment of royalties.  *Id.* (citing 30 U.S.C. § 1712(a)).  MMS is authorized to audit those payments to determine whether royalties have been overpaid or underpaid.  *Id.* (citing 30 U.S.C. §§ 1711(a),(c) and 30 C.F.R. §§ 206.150(c), 206.170(d)).  If an audit suggests an underpayment, MMS sends the lessee a letter inquiring about the perceived deficiency.  *Id.*

"If, after reviewing the lessee's response, MMS concludes that the lessee owes additional royalties, MMS issues an order requiring payment of the amount due."  *Id.*  The Attorney General can enforce these orders in federal court.  *Id.*  "An MMS payment order may be appealed, first to the Director of MMS and then to the Interior Board of Land Appeals ["IBLA"] or to an Assistant Secretary."  *Id.* (citing 30 C.F.R. §§ 290.105, 290.108).

Congress supplemented this scheme by enacting the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 ("FOGRSFA").  *Id.*  "FOGRSFA adopted a prospective 7-year statute of limitations for any 'judicial proceeding or demand' for royalties arising under a federal oil or gas lease."  *Id.* (quoting 30 U.S.C. § 1724(b)(1)).  This provision applies both to judicial actions and to MMS's administrative payment orders

3

arising on or after September 1, 1996. *Id.* The provision does not apply to judicial proceedings or demands arising from leases of minerals other than oil or gas or for underpayments of royalties on pre-September 1, 1996, production. *See id.*

A lawsuit in court to recover royalties owed to the government on pre-September 1, 1996, production is covered by 28 U.S.C. § 2415(a), which sets out a general 6-year statute of limitations for government contract actions. *Id.* The issue in the *Burton* case was whether this general 6-year statute of limitations also governed MMS administrative payment orders concerning pre-September 1, 1996, production. *Id.* Prior to the Court's decision, there had been a split on this issue between the D.C. Circuit and Tenth Circuit. *Id.* at 643. After engaging in statutory analysis, the Court held that "the 6-year statute of limitations in § 2415(a) applies only to court actions and not to the administrative proceedings." *Id.* at 649.

Within this general scheme for royalty collection, states play a prominent role. First and foremost, Congress has directed that states receive 50% of the royalty income derived from onshore properties within their borders. 30 U.S.C. § 191. Second, states play a role in the scheme's enforcement process. The Interior Department is supposed to give auditing priority to certain lease accounts identified by states. *Id.* § 1711(c)(1). In addition, the Interior Department is authorized to delegate

primary auditing authority to states for leases within their borders.  *Id.* § 1735.  States are also authorized to bring civil actions against a federal lessee for nonpayment of oil and gas royalties.  *Id.* § 1734.  Finally, states may participate with the Interior Department in the settlement of disputes over royalty obligations.  *Id.* § 1724(i).

**II. Procedural History**

On October 15, 2002, the MMS Director issued the "Guidelines Regarding Statute of Limitations for Demands and Orders and Appeals Decisions for Federal Leases."  Pl.'s Ex. 1 (hereinafter "2002 Guidelines").  The Guidelines announced a policy of extending the scope of the 7-year statute of limitations Congress enacted in 1996.  Unlike the statutory provision, MMS elected to apply the 7-year statute of limitations to royalties (1) arising before September 1, 1996 as well as after that date; and (2) for leases for production of all minerals, not just oil and gas.  Thus, MMS extended the statute of limitations to apply retroactively instead of only prospectively, and to apply to all leases, not just oil and gas leases.  MMS stated that it would "not issue orders to pay or to perform," and would "grant appeals for periods more than 7 years before the date of MMS's order absent compelling circumstances."  *Id.* at 2.  These "compelling circumstances" mirror the exceptions to the Congressionally enacted statute of limitations.  *See* 30 U.S.C. § 1724(d).

Notwithstanding Congress's explicit restrictions on the scope of its statute of limitations, MMS defended its position as being "in view of the legislative intent." *Id.*  The only other stated justification for the policy is the last sentence: "Implementation of this guidance is consistent with and is supported by our efforts to complete our compliance processes within 3 years."  *Id.*  Besides the Congressional statute of limitations, the MMS Guidelines did not rely on any other statutory provision as authority for its policy.

Beginning in 2001, the State of California conducted an audit of Federal Lease No. 006-017329-0 in accordance with 30 U.S.C. § 1735.  The state determined that $43,736 in royalties on oil production under the lease had been underpaid.  MMS thus issued an order requiring payment on August 20, 2002, to Aera Energy LLC ("Aera"), which was then responsible for the royalties.  Aera appealed this order to the MMS Director.  *Aera Energy LLC*, MMS-02-0084-O&G (Aug. 6, 2003), Pl.'s Ex. 4.

Area's sole claim on appeal was that MMS's order was barred by the six-year statute of limitations in 28 U.S.C. § 2415(a). As the Supreme Court would later do in *Burton*, the MMS Director rejected this claim.  *Id.* at 3-5.  The Director found, however, that the appeal had to be granted under the 2002 Guidelines. Specifically, the royalties at issue derived from production that occurred from 1992-1994, more the seven years before MMS's order.

6

Finding no "compelling circumstances," the Director granted the appeal because the sought-after royalties were beyond the statute of limitations announced in the 2002 Guidelines. *Id.* at 5-6. Plaintiff appealed this decision to the IBLA, but the appeal was dismissed for lack of jurisdiction because the Board concluded that the Director's decision was "the final decision for the Department." *California State Controller*, 166 IBLA 5, 10 (May 18, 2005).

Plaintiff filed this suit on February 10, 2004. Plaintiff's complaint raises four APA claims against the Department of Interior related to the collection of royalties. Count III challenges the 2002 Guidelines and Count IV challenges the MMS Director's decision on Aera's appeal. Compl. at 9-10. In July 2005, the Court stayed the case because pending agency actions could render plaintiff's claims moot. Order (July 25, 2005). The Court, however, lifted the stay so that the parties could litigate Counts III and IV because those claims were unrelated to the pending agency action. Order (Apr. 24, 2006). The parties subsequently filed their cross-motions for partial summary judgment on Counts III and IV.

## ANALYSIS

Plaintiff has moved for summary judgment on Counts III and IV, contending that MMS's actions were contrary to law, departed from its own precedents with no explanation, and failed to

consider important aspects of the problems at hand.  Defendants oppose the motion and also move for summary judgment, contending that the Court lacks jurisdiction over Counts III and IV and that MMS's actions survive APA review.  Defendants' jurisdictional arguments are that plaintiff lacks standing under the APA, the 2002 Guidelines do not constitute a final agency action under the APA, and both of MMS's decisions are matters committed to the agency's discretion by law.  The jurisdictional issues are addressed first.

## I. Prudential Standing

Defendants contend that plaintiff lacks standing under the APA to challenge either the 2002 Guidelines or the *Aera* decision. Defendants have not pursued the argument that plaintiff lacks constitutional standing, and restrict their focus instead to standing under the APA, often referred to as prudential standing.

Section 10(a) of the APA, 5 U.S.C. § 702, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  The Supreme Court has held that to qualify as "'adversely affected or aggrieved . . . within the meaning' of a statute, a plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the

8

legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396-97 (1987)).  "A party's claimed injury from administrative action, therefore, will be considered 'within the meaning' of the relevant statute for purposes of 5 U.S.C. § 702 only if the party can meet the so-called 'zone of interests' test." *Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004).

The Supreme Court has explained that "[t]he [zone of interests] test is not meant to be especially demanding." *Clarke*, 479 U.S. at 399.  Thus, "there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Id.* at 399-400.  Qualified plaintiffs include not only those who are themselves the "subject of the contested regulatory action," but also those whose interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Id.* at 399.

The D.C. Circuit has held that, "congruence of interests, rather than identity of interests, is the benchmark; the zone of interests test serves to exclude only those parties whose interests are not consistent with the purposes of the statute in question."  *Amgen*, 357 F.3d at 109 (internal quotation marks and citations omitted).  Thus, "the salient consideration under the APA is whether the challenger's interests are such that they 'in

practice can be expected to police the interests that the statute protects.'" *Id.* (quoting *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998)).

In view of this standard, it is clear that plaintiff does have standing under the APA. Plaintiff's claims at issue seek to ensure that the proper amount of royalties are collected from federal lessees. From an economic perspective, plaintiff's interests in doing so are congruent to the interests embodied in the statutory scheme because states receive 50% of collected royalties. *See* 30 U.S.C. § 191. In addition, the statutory scheme explicitly accords plaintiff and other states a prominent procedural position in the collection of royalties as states can recommend audit targets, be delegated audit authority, participate in settlements, and bring their own civil enforcement actions. *See* 30 U.S.C. §§ 1711, 1724, 1734, 1735. Therefore, these provisions of the statute itself demonstrate that plaintiff "can be expected to police the interests that the statute protects." *Amgen*, 357 F.3d at 109. Accordingly, the Court concludes that plaintiff has standing to pursue Counts III and IV in his complaint.

## II. Final Agency Action

Defendants contend that the Court lacks jurisdiction over Count III because the 2002 Guidelines do not constitute a final agency action under the APA. Defendants argue that the

Guidelines are merely an explanatory policy statement that does not bind the Department in any way. The record, however, belies defendants' assertions.

"Where, as here, no more specific statute provides for judicial review, the APA empowers a federal court to review a 'final agency action for which there is no other adequate remedy in a court.'" *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005) (quoting 5 U.S.C. § 704). The Supreme Court has held that in order for an agency action to be "final," it must "must mark the consummation of the agency's decisionmaking process," and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The D.C. Circuit has held that an action meets the second requirement if "it imposes an obligation, denies a right or fixes some legal relationship." *Home Builders*, 417 F.3d at 1278.

The 2002 Guidelines easily satisfy the first prong of the final action test. At the conclusion of the Guidelines, the MMS Director states that "Minerals Revenue Management and Appeals Division staff, as well as auditors under RSFA section 205 audit requirements, should implement this guidance *effective immediately*." 2002 Guidelines, at 2 (emphasis added). This statement demonstrates that there is nothing "tentative" or

"interlocutory" about the Guidelines; rather they "mark the consummation of the agency's decisionmaking process." *See Bennett*, 520 U.S. at 178; *Home Builders*, 417 F.3d at 1278-79.

With regard to the second prong, the D.C. Circuit has previously distinguished between unreviewable agency policy statements and reviewable agency actions. *See Croplife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-83 (D.C. Cir. 2002); *see also Home Builders*, 417 F.3d at 1279 (discussing *Croplife* in conducting its finality analysis). In resolving whether an agency's statement of policy is judicially reviewable, the ultimate question is "whether the agency action binds private parties or the agency itself with the 'force of law.'" *Croplife*, 329 F.3d at 883; *Gen. Elec.*, 290 F.3d at 382. "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 382 (internal quotation marks and citations omitted). Moreover, "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *Croplife*, 329 F.3d at 883.

Here, the 2002 Guidelines are both binding on their face and have been applied by the agency in a binding fashion. The Guidelines explicitly states that the agency "will not issue

orders to pay or to perform" and "will grant appeals" that run afoul of its expanded statute of limitations. 2002 Guidelines, at 2. As these are definitive pronouncements, "the mandatory language of a document alone can be sufficient to render it binding." *See Gen. Elec.*, 290 F.3d at 383. In addition, the *Aera* decision demonstrates that the agency is applying the Guidelines in a binding fashion. According to that decision, the 2002 Guidelines "mandate[d]" the granting of Aera's appeal. *Aera Energy LLC*, at 3. Thus, although defendants now self-servingly assert that the Guidelines do not bind MMS, the record clearly indicates otherwise. *See Croplife*, 329 F.3d at 883. Therefore, the Court concludes that the 2002 Guidelines constitute a final agency action that can be reviewed under the APA.

**III. Agency Discretion**

Defendants contend that the 2002 Guidelines and *Aera* decision were matters committed to agency discretion by law and as such are not judicially reviewable. Specifically, defendants characterize the challenged actions as decisions whether to undertake enforcement actions, and are therefore presumptively unreviewable. Because the 2002 Guidelines are a broad non-enforcement policy, however, defendants are mistaken.

Section 10 of the APA, 5 U.S.C. § 701(a)(2), makes judicial review inapplicable "to the extent that . . . agency action is committed to agency discretion by law." In *Heckler v. Chaney*,

13

470 U.S. 821 (1985), the Supreme Court construed § 701(a)(2) to create a presumption against reviewability for "an agency's decision not to take enforcement action." *Id.* at 832. The Court reasoned that courts reviewing agency action "need a meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. Individual agency decisions not to enforce a statute "involve a complicated balancing of a number of factors," and courts do not have a meaningful standard with which to evaluate the agency's balancing. *Id.* at 831. Therefore, these decisions are "committed to agency discretion by law" and are not subject to judicial review. *See* 5 U.S.C. § 701(a)(2).

While there is "no basis for review of [an agency's] *single-shot* non-enforcement decision," the D.C. Circuit has held that "an agency's statement of a *general enforcement policy* may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation after the full rulemaking process or has otherwise articulated it in some form of universal policy statement." *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) (emphasis in original). Several reasons justify this distinction. First, general enforcement policies are more likely to be direct interpretations of a statute and less likely to turn on particular combinations of facts. *Id.* at 677. Second, a general policy will normally be a clearer and more easily reviewable statement of reasons, unlike

14

statements on individual decisions to forego enforcement, which tend to be cursory or ad hoc. *Id.* Finally, "an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,' a situation in which the normal presumption of non-reviewability may be inappropriate." *Id.* (quoting *Chaney*, 470 U.S. at 833 n.4).

"In the instant case, even without actual notice and comment procedures," the issuance of the 2002 Guidelines "provides a focal point for this Court's review of the agency's action." *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 171 (D.D.C. 2000). Moreover, the Court can look to the substantive statute for a standard against which to judge the agency's enforcement policy articulated in the 2002 Guidelines and *Aera* decision. *See Crowley Caribbean*, 37 F.3d at 677 (holding that the court can find appropriate standards by utilizing the underlying statute, promulgated regulations, or other binding statements of agency policy); *Alliance for Bio-Integrity*, 116 F. Supp. 2d at 171. Specifically, with regard to the 2002 Guidelines, the Court can use as a standard Congress's overarching direction to the Department to "audit and reconcile, *to the extent practicable*, all current and past lease accounts for leases of oil or gas and take appropriate actions to make

15

additional collections or refunds as warranted." 30 U.S.C. § 1711(c)(1) (emphasis added). In addition, there are standards available to evaluate the *Aera* decision as that was not a discretionary action, but, according to MMS, was a result "mandate[d]" by the 2002 Guidelines. *Aera Energy LLC*, at 3; *see Crowley Caribbean*, 37 F.3d at 677 . Therefore, the Court concludes that the 2002 Guidelines and *Aera* decision are reviewable agency actions under the APA.

## IV. Merits of the APA Claim

Plaintiff contends that the challenged actions of the MMS must be set aside under the APA because they are contrary to provisions of the royalty collection statute, MMS acted in derogation of its own established precedent without explanation, and MMS did not consider all important aspects of the problems at hand prior to taking the contested actions. Under the APA, a court must set aside an agency action if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review requires a presumption of validity of agency action. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc). However, an agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In this case, the Court need not tackle all of plaintiff's arguments because it is clear that the agency entirely failed to consider important aspects of the problem in their decisions.  *See id.*

In propagating the 2002 Guidelines, the agency did not consider many important aspects of the relevant problem, as the Guidelines are virtually bereft of any justification whatsoever.  MMS defended its position as being "in view of the legislative intent."  2002 Guidelines, at 2.  This explanation makes no logical sense as MMS clearly expanded the scope of Congress's statute of limitations beyond the explicit boundaries set by Congress.  *See Burton*, 127 S. Ct. at 642.  The only other justification provided in the Guidelines is that they are "consistent with . . . our efforts to complete our compliance processes within 3 years."  2002 Guidelines, at 2.  MMS however, failed to explain the importance of this 3-year time frame, why the new policy is necessary to satisfy the 3-year "goal," or why this objective trumps any competing concerns.  In particular, MMS failed to address several other obvious competing concerns such as the wasted efforts of audits such as those in the *Aera* case, the loss in revenue from cutting back enforcement, the effect on

states who share the revenue and play a significant role in the enforcement process, and the upsetting of settled expectations concerning royalty collections.  And to the extent that the Guidelines policy was based on the need to conserve agency resources, MMS failed to provide any discussion about the amount of resource savings that would result and how the new policy would improve the overall functioning of the agency.

MMS's lack of explanation is particularly unreasonable in view of its overall duty to conduct audits and collect royalties. Congress directed the Department to "audit and reconcile, to the extent practicable, all current and past lease accounts for leases of oil or gas."  30 U.S.C. § 1711(c)(1).  The phrase "to the extent practicable" implies that MMS has some discretion in its enforcement policy.  In issuing the 2002 Guidelines, however, MMS did not explain how pursuing royalties over 7 years old was no longer "practicable."  In light of this statutory directive, and the general duty to consider all important aspects in deciding a policy, the Court concludes that the 2002 Guidelines are arbitrary and capricious.  *See State Farm*, 463 U.S. at 43. As the MMS Director decided the *Aera* appeal solely on the basis of the 2002 Guidelines, the Court concludes that the *Aera* decision must be set aside as well.  *See* 5 U.S.C. § 706(2)(A).

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for partial summary judgment is **GRANTED** and defendants' motion for partial summary judgment is **DENIED**.  The 2002 Guidelines and *Aera* decision are vacated and remanded to the agency.  An appropriate Order, which includes further instructions, accompanies this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**
            **United States District Judge**
            **August 30, 2007**